# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DAWN E. SIMPSON,

        Plaintiff,

v.                                  ACTION NO. 2:12cv154

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff brought this action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI")  pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. This Court recommends that the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on June 14, 2007, alleging mental and

physical impairments that caused a disability starting on March 1, 2006. R.[1] 397-405. She stated her filing was due to migraines, panic and stress attacks, depression, knee pain, carpal tunnel, chronic obstructive pulmonary disease (COPD), blood disorders, insomnia, and deteriorating spine and hips. R. 156. The Commissioner denied Plaintiff's application at the initial level on January 16, 2008 and reconsideration level of administrative review on May 8, 2008. R. 251-61, 265-81. The plaintiff then requested a hearing by an Administrative Law Judge (ALJ). R. 283, 285.

The first administrative hearing resulted in an unfavorable decision for Plaintiff, issued on March 3, 2010, by the ALJ. R. 131-43. The Appeals Council remanded the case with instructions to gather additional evidence and give further consideration to certain opinions. R. 10, 150-51. Plaintiff filed additional claims for benefits on April 6, 2010, but these were denied at the initial and reconsideration levels. R. 11, 425. The remand order from the Appeals Council, however, instructed the ALJ to consider these subsequent applications and whether the applications should be reopened. R. 11.

On July 13, 2011, Plaintiff testified at a second administrative hearing and was represented by counsel. R. 34-61. A vocational expert also appeared and testified regarding the vocational aspects of the case. R. 34-61.

On July 28, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Act. R. 27. In his order, the ALJ found that the subsequent applications made by Plaintiff should not be reopened. R. 11. On February 28, 2012, following the second ALJ decision, the Appeals Council denied Plaintiff's request for administrative review of the ALJ's decision. R. 9-13. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of

---

[1] The citations in this report and recommendation are to the Administrative Record.
[2] Plaintiff informed the Court in her Response to the Motion for Summary Judgment (ECF No. 20) that her father

judicial review. See 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

## II. FACTUAL BACKGROUND

(a) Plaintiff's Background

Plaintiff was forty-four years old at the time of her application and holds a GED. R. 37, 451. From 1983 until 2006, when Plaintiff filed for SSI and DIB, she worked as a cashier. R. 85. She worked for various periods of time, at different places, and would do a variety of work for each place. R. 85. One of her last jobs was working as a cable box retriever, which required her to drive to houses of non-paying cable customers and retrieve their cable box. R. 86.

Plaintiff reports that she is able to pay bills, count change, handle a savings account, and use a check book. R. 544. In June of 2009, Plaintiff moved from North Carolina to Virginia to care for her father. R. 39-40.[2] Plaintiff and her then-boyfriend cared for her father. Plaintiff drove him to appointments, ensured he received his medication and meals and did some light cleaning. R.40. Her boyfriend took care of the father's personal hygiene and a nurse cared for the father three days a week. R. 40. Plaintiff also reports that she is able to do some light cooking, particularly using the microwave. R. 43. On the other hand, she does report that she has had issues using utensils when eating. R. 88. The plaintiff is able to care for herself independently, and at the time of her ALJ hearing, was taking Neurotin, Vicodin, Amitiza, Topamax, and Lyrica. R. 44-46.

Prior to moving in with her father, Plaintiff took care of her roommate's trailer and helped to organize the friend's trucking logs. R. 40-41, 52-53. Additionally, Plaintiff took care of household duties for the roommate. R. 53.

---

[2] Plaintiff informed the Court in her Response to the Motion for Summary Judgment (ECF No. 20) that her father recently passed away.

<u>(b) Medical History</u>

After filing for SSI and DIB, Plaintiff's first consultative evaluation was on October 5, 2006 with Muhammad A. Bhatti, M.D., and Plaintiff reported numerous complaints. R. 591. She reported that she was diagnosed with degenerative bone disease of her L5 spine around 2001 and that she hurts all of the time. R. 591. Although she is regularly in severe pain, she informed Dr. Bhatti that she has never gone to the emergency department or been hospitalized for back pain. R. 591. She reported scoliosis, but Dr. Bhatti concluded the condition was minor and had little impact on her pain. R. 592. Plaintiff also complained of asthmatic bronchitis, which caused coughing, congestion, and wheezing two to three times a week. R. 592. Plaintiff, however, reported that she had not been hospitalized or sought emergency treatment for respiratory issues. R. 592. Plaintiff also reported left shoulder problems; but an x-ray done in 2004 was essentially normal. R. 592. She reported feet, ankle, and knee problems and reported that she has had surgeries on both knees. R. 592. Plaintiff also cited carpal tunnel syndrome and stated that she had carpal tunnel releases in both hands, migraine headaches, and neck problems. R. 592-93. Additionally, Dr. Bhatti noted Plaintiff had a "questionable" history of anemia. R. 593.

Dr. Bhatti concluded that Plaintiff overreacted to the physical examination. R. 594-95. Although Plaintiff refused to squat, she was able to bend over up to almost 90 degrees. R. 595. Similarly, Dr. Bhatti noted that although Plaintiff's Tinel's sign was positive, her straight leg-raising was negative in both the seated and supine position, but that it produced pain in both her hips subjectively. R. 595.

Dr. Bhatti found Plaintiff's gait to be normal and sustained, and noted that she did not need any assistive device for ambulation. R. 595. Plaintiff's dexterity was normal, and her ability to pinch, grasp, and manipulate small and large objects was within normal limits. R. 595.

On December 4, 2007, Plaintiff had a consultative evaluation with Tin T. Lee, M.D. R. 655. Plaintiff's chief complaints included lumbar degenerative disc disease, sclerosis and left shoulder plain, chronic bronchitis, headaches, carpal tunnel syndrome, anxiety and depression, knee degeneration, and tenderness. R. 655. Plaintiff moved into the exam room with a slow gait, but she used no assistive device to move around. R. 658. Dr. Lee, however, noted that Plaintiff had some difficulty getting up on the exam table due to tenderness of both knees, low back, and both ankles. R. 658.

According to Dr. Lee, evaluation of Plaintiff's lumbar spine was impossible due to Plaintiff's unstable posture and tenderness and spasms. R. 658. Plaintiff did have limitations in her range of motion of her left shoulder, knees, and wrists, but her ambulation was "fairly stable." R. 658-59. Dr. Lee reported Plaintiff experienced tenderness on both ankles, knees, and lower back. R. 658-59. Dr. Lee also noted Plaintiff wore wrist and ankle splints. R. 659. He opined that physically, he believed that there was a severe impairment affecting Plaintiff's ability to perform normal daily tasks due to tenderness of her lower back, left shoulder, knees, ankles, and wrists, with weakness in both hands. R. 659.

Plaintiff began going to Victoria L. Harris, PA-C, and Edwin L. Hartman, M.D., on March 9, 2007. R. 651. At her initial appointment, Plaintiff reported problems with depression, chronic bronchitis, migraines, arthritis, and reflux. R. 651-52. Examination found that Plaintiff had no clubbing, cyanosis or edema present. R. 651. Ms. Harris noted that Plaintiff had a normal CT scan, and that Plaintiff's past migraine medications had not been helpful. R. 652. Ms. Harris recommended a trial of Maxalt for her headaches, to continue with Nexium for her reflux, and a GI referral at Plaintiff's request. R. 652.

Plaintiff again treated with Ms. Harris and Dr. Hartman on April 11, 2007. R. 649.

Plaintiff reported she continued to experience migraines, and also reported that her reflux was doing well on Nexium. R. 649. Ms. Harris further reported that Plaintiff was taking Ultracet for pain in her hips. R. 649.

Plaintiff again went to Ms. Harris and Dr. Hartman on May 23, 2007, for treatment for anxiety and headaches. R. 647. Plaintiff reported anxiety due to abusive relationships with her then-husband and daughter. R. 647. Ms. Harris also noted a potential iron deficiency and anemia issues and recommended a referral to Dr. Anderson. R. 647. On June 11, 2007, Plaintiff again went to Ms. Harris and Dr. Hartman for fatigue and reflux. R. 645. Ms. Harris noted that Plaintiff had an endoscopy which showed esophagitis with severe inflammation. R. 645. Anxiety and stress from Plaintiff's daughter and husband, who she was separated from, continued to impact Plaintiff at this appointment. R. 645.

Two months later, on September 17, 2007, Plaintiff went to Ms. Harris and Dr. Hartman with complaints of anemia and reflux. R. 644. Plaintiff reported that she had gone to Dr. Anderson for iron deficiency and been getting iron injections. R. 644. She also complained of pain in her lower back, left shoulder, hips, and knees, and rated her pain as an eight out of ten. R. 644. She was directed to continue with her Prevpack and Nexium, and to continue to follow up with her physician for injections. R. 644.

On November 27, 2007, Ms. Harris, when filling out a checkbox form to determine eligibility for food assistance for Wilson County Department of Social Services, opined that Plaintiff was disabled or unable to work 30 hours per week as of November 13, 2007. R. 775.[3]

Approximately ten months later, on October 9, 2008, Plaintiff again went to see Ms.

---

[3] It should be noted that the North Carolina Department of Health and Human Services deemed Plaintiff disabled on July 31, 2009 for aid to the Disabled Medical Assistance. R. 492. The letter sent to Plaintiff informing her of this decision, however, specifically states that this finding has no bearing on any SSI or DBI claim, and the Commissioner can apply its own standards to SSI and DBI claims. *See* 20 C.F.R. § 404.1504, 416.904.

Harris. R. 710. Ms. Harris noted although Plaintiff said she was in constant pain, there was "no specific" complaint of pain. R. 710. Further, Ms. Harris noted that Plaintiff had not been to Dr. Anderson in ten months. R. 710. On March 30, 2009, Ms. Harris treated Plaintiff for insomnia, anemia, and arthritis. R. 709. Although Plaintiff reported that her pain was 8/10, Ms. Harris noted that Plaintiff was able to walk to and from the exam room and get out of her chair without difficulty. R. 709.

On December 28, 2007, state agency physician Charles A. Burkhart, M.D., reviewed Plaintiff's records and opined that she could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and that she was limited in her upper and lower extremities in pushing and pulling. R. 662, 668. In a checkbox form for Postural Limitations, Dr. Burkhart assessed that Plaintiff could frequently climb ramps/stairs, and stoop, kneel, crouch, and crawl; and occasionally balance climb ropes and ladders. R. 663. Dr. Burkhart also opined that Plaintiff had "frequent but not continuous" hand and finger manipulation problems due to carpel tunnel syndrome. R. 664. He further noted that Plaintiff should avoid concentrated exposure to hazards, but also noted that Plaintiff had no other environmental limitations. R. 665.

On December 22, 2008, state agency physician, Pamela Jessup, M.D., reviewed Plaintiff's records and concluded that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour work-day. R. 684, 690. She determined that Plaintiff was not limited in either pushing or pulling in her extremities, and further opined that Plaintiff could frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; occasionally climb ladders/ropes/scaffolds; and that she could frequently reach overhead with her left shoulder, and

frequently handle bilaterally. R. 684-86. She also found that Plaintiff should avoid concentrated exposure to hazards such as fumes, odors, dusts, gases, and poor ventilation. R. 687.

On October 1, 2009, Plaintiff went to Rachid Idriss, M.D., for treatment with regards to neck and back pain and headaches. R. 906. Plaintiff informed Dr. Idriss that her disability claim was pending. R. 906. Dr. Idriss noted that Plaintiff was alert and in no acute distress. R. 907. Further, Dr. Idriss observed that Plaintiff's gait with toe and heel walking was normal and that her cervical and lumbar spine range of motion was full and functional, but slightly painful on extension. R. 907. Dr. Idriss rated Plaintiff's strength as 5/5 in her upper and lower extremities and found her sensation to touch and pinprick was normal. R. 907. Although Plaintiff had tenderness in her cervical and lumbar spine, her straight leg-raising test, Faber test, Spurling Test, and Babinski sign were all negative. R. 907. Dr. Idriss opined that Plaintiff had chronic neck pain; lower back pain; sciatica; chronic myofascial pain syndrome; chronic fatigue syndrome; and restless leg syndrome. R. 907. He recommended MRIs of Plaintiff's cervical and lumbar spine, but MRIs completed on October 13, 2009 of Plaintiff's cervical and lumbar spine were normal. R. 882, 884, 907.

On October 10, 2009, Plaintiff had a consultative examination with Renee Goodison-Ollivierre, DO. R. 761. Dr. Goodison-Ollivierre noted that Plaintiff was unable to give details on her medical history, except that she has "many illnesses." R. 761. In assessing her illnesses on her daily life, Plaintiff reported that she can do a little cleaning—including vacuuming for a short period of time—and she can bathe herself. R. 762.

As far as Dr. Goodison-Ollivierre's observations, Dr. Goodison-Ollivierre noted that Plaintiff was able to walk into the exam room without assistance and was accompanied by a young girl, approximately 7 years old, who she was apparently babysitting. R. 762. Dr.

Goodison-Ollivierre also observed that although Plaintiff had splints on her ankles and knees, she was not using a cane, and was able to take all of the splints off easily. R. 762. Dr. Goodison-Ollivierre found that this was inconsistent with her complaints. R. 762. Further, Dr. Goodison-Ollivierre noted that although Plaintiff complained of dizziness when she walked, she did not need to hold onto a wall or any other device when moving around. R. 763. In assessing Plaintiff's range of motion, Dr. Goodison-Ollivierre concluded that Plaintiff gave poor effort when the doctor was assessing her range of motion. R. 763.

In making her functional assessment and medical source statement, Dr. Goodison-Ollivierre opined Plaintiff could lift up to 10 pounds continuously, 25 pounds frequently, and 50 pounds occasionally; could sit for 6 hours in an 8-hour day; stand for 4 hours in an 8-hour day; walk for 3 hours in an 8-hour day without interruptions; and Plaintiff could ambulate without the assistant of a cane. R. 756, 764. She further assessed that Plaintiff could only occasionally reach overhead and finger, feel, and push/pull with her hands. R. 764. Dr. Goodison-Ollivierre also opined that Plaintiff could operate foot controls frequently on the right and occasionally on the left, and that Plaintiff should never climb stairs, balance, stoop, kneel, or crawl. R. 765. Further, Dr. Goodison-Ollivierre opined that Plaintiff can go shopping; ambulate without a cane; walk a block at a reasonable pace on a rough or uneven surface; use standard public transportation; can climb a few steps at a reasonable pace with a single hand rail; prepare simple meals; can care for her personal hygiene; and sort, handle, and use paper files. R. 760.

On January 29, 2010, Plaintiff went to Johnston Medical Associates and was examined by Mark Bowling, M.D. R. 768. Plaintiff went in for a check-up and reported that she was doing "ok." R. 768. Dr. Bowling noted Plaintiff had Restless Leg Syndrome which seemed better on medication, and used tobacco. R. 768.

As part of her claim for SSI and DBI, on September 28, 2010, Plaintiff had a consultative examination with Natavan Karimova, M.D. R. 908. In the family history section, Dr. Karimova wrote the following:

> According to the claimant, when I asked her about her family history, I just asked one question and she just started hysterically crying. There were no tears at all, and then she started coughing and suffocating like a child after a prolonged period of crying. I asked the claimant if she wanted to go home, and then she stopped. I did not even see one drop of tear in her eye.

R. 909. Plaintiff said that she was crying because of her father's poor health. R. 910. Because Plaintiff was crying, Dr. Karimova asked Plaintiff if she wanted to go home, but Plaintiff responded that she had, in Dr. Karimova's words, "failed the physical examination five times so she want[ed] to get it over with, and she d[id] not want to fail it again." R. 910. Dr. Karimova noted that during the physical examination, Plaintiff gave very poor effort. R. 910. He further noted that when Plaintiff was asked the same question twice, she would give two different responses. R. 910.

Dr. Karimova wrote that he could not say what Plaintiff's mood or affect was because plaintiff was "acting." R. 910. He did observe that Plaintiff did not need any assistive devices, that she had no problem moving from the chair to the table, and that she was comfortable in the chair. R. 910. Dr. Karimova also wrote that Plaintiff would not let him examine her abdomen, and that when he touched Plaintiff, she jumped off of the table. R. 910. Dr. Karimova noted that Plaintiff was able to walk into the office without any problems, but that Plaintiff told Dr. Karimova that she could not walk on her heels or toes, and refused to try. R. 911. Plaintiff also refused to do rapid alternating movements with her wrists. R. 911. Plaintiff did, however, almost fall over when she closed her eye during the Romberg, but because the rest of the neurological exam was normal, Dr. Karimova concluded the Romberg test was not negative. R. 911.

Dr. Karimova noted that Plaintiff gave very poor effort on some of her range of motion examinations, and further Plaintiff refused to do the straight leg raising test. R. 911. Dr. Karimova rated Plaintiff's strength as 4/5, but felt that Plaintiff gave very poor effort. R. 911. He assessed that Plaintiff could perform light work where she would be able to stand for 6 hours in an 8-hour day; sit for 6 hours in an 8-hour day; did not need any assistive devices; would be able to lift and/or carry 20 pounds occasionally and 10 pounds frequently. R. 912. Dr. Karimova concluded his report by again noting that Plaintiff gave very poor effort throughout the exam, and further, Plaintiff refused to complete half of the exam.

On September 29, 2010, state agency physician Carolina Longa, M.D., reviewed plaintiff's records and opined that based on Plaintiff's complaints and the totality medical and non-medical evidence, Plaintiff was partially credible. R. 187, 190. Dr. Longa wrote that Plaintiff could occasionally lift and/or carry 20 pounds, and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and she could not perform tasks requiring constant pushing and pulling with either upper extremity. R. 187-88, 90. Dr. Longa further opined that Plaintiff could climb ramps/stairs and crawl frequently; climb ladders/ropes/scaffolds occasionally; and that her abilities to balance, stoop, kneel, and crouch were unlimited. R. 188. She noted that Plaintiff could perform tasks requiring handling and fingering frequently, but not constantly, and that Plaintiff could not perform repetitive reaching overhead with the left upper extremity. R. 189. Finally, Dr. Longa opined that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. R. 189.

On March 29, 2011, state agency physician, Patricia Staehr, M.D, reviewed Plaintiff's records. R. 246. Dr. Staehr concluded that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour work day; sit about 6

hours in an 8-hour work day; and her ability to push and pull was limited to frequent and not constant. R. 240. She further assessed that Plaintiff could climb ramps/stairs and crawl frequently; climb ladders/ropes/ scaffolds occasionally; and that her abilities to balance, stoop, kneel, and crawl were unlimited. R. 240-41. Dr. Staehr also noted that Plaintiff could reach overhead with her left arm occasionally, and that her handling and fingering was limited to frequent. R. 241. She also assessed that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. R. 242.

<u>(c) Psychological Examinations</u>

As part of the SSI and DBI process, Plaintiff had a psychological consultative examination with Carol Gibbs, M.D., on June 8, 2010. R. 902. Dr. Gibbs noted that Plaintiff's speech was fluent, and her thought process was linear, relevant, and coherent, but also noted that Plaintiff was "in the below average range of intellectual functioning." R. 902. Plaintiff told Dr. Gibbs that she had been depressed for the past six or seven years, has regular panic attacks and constantly worries. R. 902. She reported that she only slept two to three hours a night. R. 902. She also reported that she had never seen a mental health professional and that she "deals with it on [her] own." R. 902. Plaintiff reported last working in 2006 repossessing satellite boxes, as a management trainee at a convenience store, and delivering papers. R. 903. Plaintiff could not explain to Dr. Gibbs why she stopped working. R. 903. Plaintiff reported living with her father, driving him to his appointments, making sure he took his medication, doing some light cleaning, and basic personal care for herself. R. 903.

Based on her examination of Plaintiff, Dr. Gibbs assessed that Plaintiff should be capable of understanding simple, repetitive instructions and tasks, but that she may have more difficulty consistently following through with complex instructions and complex tasks. R. 904. She also

assessed that Plaintiff's ability to respond to work pressures would be moderately impaired and that her ability to deal with others in a work setting would be mild to moderately impaired. R. 904. Dr. Gibbs rated Plaintiff's global assessment of functioning (GAF) at 65, which is indicative of only mild symptoms or some difficulty in social, occupational, or school functioning. R. 904. *See* Diagnostic and Statistical Manual of Mental Disorders 34 (DSM-IV-TR) (4th ed., 2000).

Plaintiff went to Alison Christian-Taylor, M.D. on February 22, 2011. R. 778. Plaintiff reported that she was "hurting all over" on the day of the exam and informed the doctor that she was applying for disability. R. 778. Dr. Christian-Taylor noted that Plaintiff was positive for depression, but that it was controlled by medication at that time. R. 778. On May 24, 2011, Plaintiff had a follow-up with Dr. Christian-Taylor and reported that her depression was worse due to her father's illness. R. 779.

Prior to these examinations, on December 28, 2007, state agency psychologist Robert A. Johnson, Ph.D., reviewed Plaintiff's records. R. 669. He opined that Plaintiff's mental impairments were not severe. R. 669. State agency psychologist Eleanor E. Cruise, Ph.D., reviewed Plaintiff's records and made similar findings to Dr. Johnson on May 1, 2008. R. 691.

On August 26, 2010, state agency psychologist David Deaver, Ph.D., reviewed Plaintiff's records and assessed that Plaintiff "can sustain concentration and attention sufficiently to complete simple tasks and instructions with adequate persistence, and at an acceptable pace." R. 191-92. He noted that Plaintiff would have some difficulty interacting with the public for extended periods, but that "her ability to interact with others is largely intact, and that she could get along with co-workers and accept supervision." R. 191. Dr. Deaver also noted there could be some limitations in Plaintiff's ability to adapt to changes and stresses in the workplace. R. 191.

On March 30, 2011, state agency psychologist Kim Zweifler, Ph.D, reviewed Plaintiff's records and concluded that Plaintiff's "allegation of disability from mental problems is partially credible" because she has some history of depression and anxiety. R. 222. Dr. Zweifler also noted that Plaintiff has no history of psychiatric hospitalizations or treatment, and has reported improvement with medication. R. 222. Dr. Zweifler pointed out that Plaintiff can perform her activities of daily living including caring for her father. R. 222. She assessed that Plaintiff can operate in a stable, low pressure setting. R. 222.

<u>(d) ALJ Hearing and Supplemental Hearing</u>

At the ALJ hearing, Plaintiff testified that at that time, in 2009, she lived with her boyfriend and her father. R. 40, 42. Her father was ill and required constant care, and Plaintiff testified that she gave him his pain medications and made sure that he received his meals. R. 40-41. Her father also had a nurse care for him three days a week and Plaintiff's boyfriend helped him shower twice a week. R. 40. Prior to moving to Virginia to be with her father, Plaintiff was living with a roommate who was a truck driver, and she assisted him in keeping his log books and "kept" the house for him. R. 41, 53.

As for her activities, Plaintiff testified that she did light cooking, mostly using the microwave and light housework, such as vacuuming and sweeping as needed. R. 43. Plaintiff testified that she could drive, and go shopping for food and other things, and she could care for her personal needs. R. 45-46. At that time, she took Neurontin, Vicodin, and Lyrica and that she smoked a half pack of cigarettes per day. R. 44, 47.

At the hearing, she testified that she "maybe" could lift or carry 10 pounds and finds it difficult to lift using only one hand because of her carpal tunnel. R. 46.[4] She also testified that

---

[4] It should be noted that at a supplemental hearing in 2010, Plaintiff testified that she was only able to pick things up with her right arm, because her left arm was limited in its range of motion. R. 87

she believed she could walk two and a half to three blocks if she pushed herself. R. 46-47. Plaintiff further testified that she could sit for an hour at a time, but not consistently, where she would have to resituate herself. R. 47. In questioning by her attorney, Plaintiff said that when at home, she normally "stretch[es] out on the couch" and situates pillows under her to minimize the pressure and pain. R. 48-49.

Vocational expert, Robert Edwards, testified at the ALJ hearing, The ALJ asked Mr. Edwards whether a hypothetical individual of Plaintiff's age, education, and work experience, who could perform light work except that she could sit for 8 hours in an 8-hour day; stand for 6 hours in an 8-hour day, but should be allowed to alternate sitting and standing every 30 minutes; never climb; never be exposed to unprotected heights or dangerous machinery; could only occasionally bend and squat; no overhead work; and no pushing or pulling more than 10 pounds, could perform work that exists in significant numbers in the national economy. R. 57. The ALJ also asked the vocational expert to assume the individual was limited to simple, repetitive, non-productions tasks. R. 57.

The vocational expert testified that such a hypothetical individual could perform jobs such as cashier (825 local[5] and 160,000 national positions); office helper (1,350 local and 275,000 national positions); and information clerk (840 local and 165,000 national positions). R. 58.[6] Based on questioning from Plaintiff's counsel, Mr. Edwards also testified that a person

---

[5] The vocational expert's local number of jobs is defined those jobs found in "the greater Hampton Roads area including northeastern North Carolina." R. 57. At the supplemental hearing, a different vocational expert testified and used the state of North Carolina as the "local" area. The vocational expert testified that there were a similar number of jobs available to Plaintiff, as Mr. Edwards found. R. 95.

[6] The ALJ also asked Mr. Edwards whether the jobs that the vocational expert identified comported with the Dictionary of Occupational Titles (DOT), and the vocational expert noted that they did, except that the DOT does not address alternating between sitting and standing, however, based on his work experience as a vocational counselor, he identified jobs that would allow for the sit/stand option, and that also met the other parameters of the hypothetical. R. 58-59.

could miss no more than two days of work per month and expect to keep that job and that a person requiring multiple naps each day would be unable to keep employment. R. 59.

A supplemental ALJ hearing was held on February 19, 2010. At this hearing, Plaintiff testified that she continued to have headaches, although she was taking Topamax. R. 88. She also explained that she wears ankle and knee braces because of the pain in those areas and the braces provide some support to her. R. 89. However, Plaintiff said that she used a cane four days a week on average. R. 92. Plaintiff told the ALJ that she was not able to crawl on the floor with her grandchildren and experienced painful muscle spasms twice a week. R. 91.

Ms. Cecilia Thomas, a vocational expert, testified at the supplemental hearing. Although she defined the local area differently than Mr. Edwards, she concluded there were a similar number of jobs available to Plaintiff as Mr. Edwards did. R. 94-95.

## STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh

conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

### III. ANALYSIS

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for DIB and a period of disability, and be under a "disability" as defined in the Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security

Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

The ALJ made a number of findings in his decision. First, he found that Plaintiff met the insured status requirement through June 30, 2010. R. 13. Second, he concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, March 1, 2006. R. 13. Third, the ALJ found that Plaintiff has a number of severe impairments including; carpal tunnel syndrome, chronic back pain and neck pain with a diagnosis of degenerative disc disease, obesity, restless leg syndrome, osteoarthritis, fibromyalgia, anxiety and depression.[7] R. 13. The ALJ concluded, however, that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart 4, Appendix 1." R. 13. In making this finding, the ALJ concluded that Plaintiff's carpal tunnel syndrome did not require continuing surgical management and that the record did not include evidence of disorganization of motor function with the required severity. R. 13. Similarly, with regards to Plaintiff's osteoarthritis, the ALJ concluded the condition "has not

---

[7] The ALJ found that the other alleged conditions, including irritable bowel syndrome, anemia, and chronic obstructive pulmonary disorder, did not meet the requirements to be considered severe. R. 13.

resulted in an inability to perform fine and gross movements effectively or an inability to ambulate effectively." R. 13. Additionally, ALJ found that any mental impairments did not meet the requirements of the Administration's guidelines and that these conditions have had only a mild restriction on Plaintiff's daily life and social functions, and moderate limitations on her concentration and persistence of pain. R. 13-14.

Further, after looking at the record, the ALJ concluded that Plaintiff had a residual functional capacity (RFC) to "lift 20 pounds occasionally and 10 pounds frequently, stand or walk for 6 hours and sit for 8 hours in an 8-hour workday. [Plaintiff] retains the ability to perform work activities that allow her to alternate sitting and standing every 30 minutes. [Plaintiff] can perform work activities that do not require her to push or pull more than 10 pounds occasionally and that do not require more than occasional bending or squatting. [Plaintiff] has the residual function capacity to perform simple, repetitive, non-production tasks." R. 15-16.

Additionally, the ALJ found that Plaintiff was unable to perform any past relevant work, that she was 44 years old at the alleged onset date, she has at least a high school education and is able to communicate in English, and that Plaintiff's past work is considered unskilled. R. 22. Based on these findings, the ALJ concluded that there were a significant number of jobs that Plaintiff could do in the current economy and that Plaintiff has not been under a disability as defined by the Social Security Act. R. 22-23.

Plaintiff filed three letters with the Court. The first letter was filed on March 23, 2012, which the Court construes as the Complaint. ECF No. 3. The second was filed on August 13, 2012, which the Court construes as a Motion for Summary Judgment. ECF No. 15. Plaintiff filed the third letter on October 11, 2012, which the Court construes as a Reply to Defendant's Motion

for Summary Judgment. ECF No. 20.

In these three letters, Plaintiff makes a number of arguments. Plaintiff argues that the ALJ should not have given weight to the opinions of consultative doctors, who only saw Plaintiff once, but instead should have relied on Plaintiff's treating medical professionals. ECF Nos. 3 & 15. Further, Plaintiff contests a number of observations and findings by various doctors and the ALJ, and presents her recollection of events, arguing that no one knows her pain but her. ECF Nos. 3, 15 & 20. Plaintiff also argues that the ALJ's ruling as far as her RFC was unfair "considering all of my medical conditions that prevent me from being able to work enough to support myself." ECF No. 3.

(1) <u>Minimal Weight Given to Treating Medical Professional's Opinion Supported by Commissioner's Regulations and Evidence on the Record</u>

Plaintiff objects to the ALJ's decision to not give her treating medical professional, Ms. Victoria Harris, a physician's assistant, more weight, and further objects to the ALJ relying on consultative doctors. ECF No. 3 & 15. The ALJ's decision to rely on consultative doctors, rather than the opinion of a physician's assistant follows the Commissioner's regulations for making such determinations and is supported by evidence on the record.

The ALJ followed the appropriate regulations in assigning weight to each opinion by a medical professional. Ms. Harris was a physician's assistant and treated the Plaintiff on a number of occasions. She opined that Plaintiff was disabled, and had been since November 27, 2007, for purposes of determining Plaintiff's eligibility for food assistance. R. 21, 775. The ALJ found that Ms. Harris' opinion was not supported by the objective medical evidence, and therefore, given little weight. R. 21. Based on the Agency's regulations and the evidence, the ALJ did not err in making this determination.

Under the Agency's regulations, the ALJ was not bound to give Ms. Harris' opinion

controlling weight. A treating source's opinion on issues regarding the nature and severity of an impairment is to be given controlling weight if it is well supported by medically-accepted clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1526(b), 404.1527(d), 416.927(d)(2). A physician's assistant, like Ms. Harris, however, is not considered an acceptable medical source, and therefore, is not entitled to be given controlling weight. *See* 20 C.F.R. § 404.1513(a), 416.913 (a).

Additionally, Ms. Harris's opinion was offered for the purpose of establishing disability in Plaintiff's application for food assistance. R. 775. Although Plaintiff may have been deemed disabled for food assistance purposes, such a determination holds little weight in an ALJ's determination. The Agency has its own standards for disability, and is not beholden to another agency's definition. *See* 20 C.F.R. § 404.1504, 416.904. Following on that, one court has gone as far as to hold that another agency's determination is "irrelevant" when determining SSI and DBI. *Taylor v. Astrue*, 2010 WL 1372458, *3 (W.D. Pa. 2010). Regardless, the ALJ is not required to give any weight to another agency's determination.

Most importantly, however, the determination of disability is a decision reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). This means that an opinion of whether a plaintiff qualifies as disabled under the Act is not entitled to controlling weight and "[a] statement by a medical source that [a plaintiff is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the plaintiff] is disabled." *Id.* Rather than giving such a determination controlling weight, the ALJ is charged to give any opinion weight based on the entire facts on the record. *See* 20 C.F.R. §§ 404.1527(c)(1)-(4), 416.927 (c)(1)-(4). Therefore, based on the Agency's regulations, the ALJ did not err by failing to give Ms. Harris's

opinion on disability controlling or even significant weight.

In addition to following the applicable regulations, the ALJ's finding that Ms. Harris's opinion was not supported by the evidence in the record is supported by substantial evidence. Ms. Harris's opinion is not supported by her own observations and is not supported by the objective medical evidence on the record.

Prior to opining that Plaintiff was disabled, Ms. Harris noted that Plaintiff had a normal CT scan. R. 652. Further, at an appointment approximately ten months after opining that Plaintiff was disabled, Ms. Harris observed that although Plaintiff complained of always being in pain, Plaintiff had "no specific" complaint of pain. R. 710. Approximately six months after that appointment, Ms. Harris noted that Plaintiff had no difficulty walking to and from the exam room and getting out of her chair. R. 709. Further, in the Court's review of Ms. Harris' notes in the record, the Court finds only subjective complaints of pain by Plaintiff and little objective evidence to support Ms. Harris' opinion that Plaintiff was disabled.

Ms. Harris's opinion is also not in line with the other objective medical evidence in the record. Dr. Bhatti noted that although Plaintiff reported regularly being in severe back pain, she never sought emergency department care and never was hospitalized for that pain. R. 591. Dr. Bhatti noted that a left shoulder x-ray, taken in 2004, was normal, although Plaintiff complained of pain there. R. 592. Similarly, Dr. Bhatti reported that Plaintiff was able to bend over to almost 90 degrees and that her gait was normal and sustained. R. 595. A number of doctors, including Dr. Bhatti, noted that Plaintiff did not need assistance to ambulate. *See e.g.,* R. 595, 906, 910.

Dr. Idriss's objective observations are similar to Dr. Bhatti's. Dr. Idriss reported that Plaintiff was alert with no acute distress, Plaintiff's gait was normal, and that her cervical and lumbar spine range of motion was full and functional, although Plaintiff had some pain when

extending. R. 907. Dr. Idriss observed some tenderness in Plaintiff cervical and lumbar spine, but Plaintiff's straight leg-raising test, Faber test, Spurling Test and Babinski sign were negative. R. 907.

In reviewing the Commissioner's denial of benefits, this Court is limited to examining whether substantial evidence exists on the record to support the ALJ's findings. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not reweigh evidence, make credibility determinations, or substitute its judgment. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456.

Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Based on the evidence and the standard this Court must follow, the ALJ's finding that Ms. Harris' opinion should not be given much weight is supported by substantial evidence. A number of medical professionals, including Ms. Harris, noted Plaintiff had no problem ambulating. Additionally, a number of tests performed by consultative doctors were negative. Plaintiff did not seek emergency treatment or hospitalization for the pain she complained of. This objective evidence runs counter to Ms. Harris' opinion and is sufficient to find that the ALJ's finding is supported by substantive evidence. Because Ms. Harris' opinion is contradicted by objective medical evidence, the ALJ is not bound to give it any weight. *See* 20 C.F.R. §§ 404.1526(b), 404.1527(d), 416.927(d)(2).

Along with arguing that the ALJ should have given weight to Ms. Harris, Plaintiff argues that it was improper for the ALJ to rely on consultative doctors' opinions, who only saw Plaintiff once. ECF No. 3 & 15. Under Agency regulations, although non-treating physician's opinions are weighed by stricter standards, it can be proper for the ALJ to give greater weight to consultative physicians', and even non-examining physicians', opinions than to treating physicians or professionals. *See* SSR 96-6p, 1996 WL 374180 (July 2, 1996). Regardless of the source, for an opinion to be given significant weight it must comport with the objective medical evidence on the record. 20 C.F.R. 404.1527(c)(3), 416.927(c)(3).

As discussed, Ms. Harris's opinion did not follow the medical evidence known to Ms. Harris or in the record generally. Based on this, it is not improper that Ms. Harris's opinion be given less weight than those examining or non-examining doctors, who's opinion was supported by objective medical evidence.

### (2) ALJ's Credibility Determination of Plaintiff is Appropriate

Plaintiff attacks the ALJ's credibility determination of the Plaintiff's testimony regarding her pain and ability to work. ECF No. 20. This attack goes to two parts of the ALJ's findings. First, Plaintiff challenges the ALJ's credibility determination of Plaintiff's subjective pain, and second, she challenges the ALJ's finding regarding Plaintiff's residual functional capacity, arguing she cannot work to the level found by the ALJ.

### (a) Subjective Pain Credibility

Plaintiff argues that only she knows the pain she suffers. ECF No. 20. The Court construes this as a challenge to the ALJ's finding that Plaintiff's subjective pain reports were not credible. The ALJ found that based on the objective evidence, Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." R.

20-21.

This Court must give great deference to the ALJ's credibility determinations. *See e.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-91 (1951). The Fourth Circuit has held that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). Therefore, this Court must accept the ALJ's assessment of Plaintiff's credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason. *Id.*

Furthermore, as the Fourth Circuit recognizes, the Plaintiff's subjective statements about her pain are not, alone, conclusive evidence that plaintiff is disabled. 20 C.F.R. § 404.1529(a). Rather, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 591-92 (4th Cir. 1996). Finally, Social Security Ruling 96-7p states that the evaluation of a Plaintiff's subjective complaints must be based on consideration of all the evidence in the record, including, but not limited to: (1) medical and laboratory findings; (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; and (3) statements from both the individual and treating or examining physicians about the claimant's medical history, treatment, response, prior work record, and the alleged symptoms' effect on the ability to work.

The Court finds no "exceptional circumstances" exist, in this case, that warrant reversing the ALJ's credibility determination. *See Edelco, Inc.*, 132 F.3d at 1011. Although Plaintiff complained of intense pain, she did not seek emergency department care or hospitalization. R. 591. Although Plaintiff complained of dizziness when she walked, Plaintiff did not need

assistance devices to ambulate and was able to quickly take off ankle splints when needed. R. 762. Plaintiff's MRIs on her cervical and lumber spine were normal, *see* R. 882, 884, 907, and an x-ray of her left shoulder was normal. *See* R. 592. Moreover, doctors repeatedly noted that Plaintiff gave poor effort, refusing to complete tests, and even may have acted in examination sessions. *See* R. 763, 910. Based on this ample evidence to question Plaintiff's credibility, no exceptional circumstances exist.

Along with challenging the ALJ's finding regarding her pain, Plaintiff also takes issue with a number of specific facts and observations. *See* ECF Nos. 3, 15 & 20. For example, Plaintiff explains that when Dr. Karimova attempted to touch her abdomen during an exam and Plaintiff jumped up and refused to let the doctor touch her abdomen, her reaction was because she had pins that protruded from her abdomen. ECF No. 20. Nevertheless, it is not the Court's role to reweigh the evidence in light of Plaintiff's explanations. *See Craig v. Chater*, 76 F.3d 85, 589 (4th Cir. 1996); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Instead, in reviewing the Commissioner's denial of benefits, this Court is limited to examining whether substantial evidence exists on the record to support the ALJ's findings. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456). As the Court discusses in Part 2(b), the record includes substantial evidence to support the ALJ's finding.

 b. Residual Functional Capacity (RFC) Finding

Plaintiff challenges the ALJ's finding regarding her RFC. ECF No. 20. The ALJ concluded that Plaintiff's RFC was that she could "lift 20 pounds occasionally and 10 pounds frequently, stand or walk for 6 hours and sit for 8 hours in an 8-hour workday" and can "perform work activities that allow her to alternate sitting and standing every 30  minutes." R. 15. The ALJ

found that Plaintiff would need work that does not "require her to push or pull more than 10 pounds occasionally and that do[es] not require more than occasional bending or squatting" and is limited to "simple, repetitive, non-production tasks." R. 16. Based on this RFC and Plaintiff's background and education, the ALJ concluded there are significant numbers of jobs available for that the Plaintiff could do. R. 22. On the other hand, Plaintiff alleges that working thirty hours a week would be hard and she would be "lucky" if she were able to handle three days a week of work. ECF No. 20.[8]

After step three of the ALJ's five part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's residual functional capacity. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The residual functional capacity must incorporate impairments supported by objective medical evidence and impairments based on credible complaints made by the claimant. The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* In doing so, the ALJ must consider all relevant medical evidence in the record. *Id.* If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individuals' ability to work. *Id.* at 595. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96.

---

[8] Plaintiff refers to a "grandfather clause" to disability that she is eligible for. ECF No. 20. The Court is unaware of any such grandfather clause that would circumvent the ALJ's decision.

In reviewing the Commissioner's denial of benefits, this Court is limited to examining whether substantial evidence exists on the record to support the ALJ's findings. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not reweigh evidence, make credibility determinations, or substitute its judgment. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456.

Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In looking at the record, the objective medical evidence, the conservative treatment of Plaintiff's condition, and Plaintiff's daily activities, the Court concludes that there is substantial evidence to support the ALJ's finding regarding Plaintiff's RFC and the ALJ's finding that Plaintiff's condition was not disabling.

Plaintiff's tests tended to show normal results or mild restrictions. In 2004, Plaintiff had an x-ray on her left shoulder that was considered normal. R. 592. In 2007, after complaining of pain, Plaintiff had a CT scan done that was also considered normal. R. 652. Further, Plaintiff informed one examiner that she never sought emergency department care and never was hospitalized for her neck or back pain. R. 591, Further, a number of physicians noted that Plaintiff did not need assistance to ambulate and that her gait was normal. *See e.g.,* R. 595, 906, 910.

Although Plaintiff refused to complete a number of physical tests, those that she did

complete tended to show that her condition was not disabling. Plaintiff was able to bend over to almost 90 degrees when examined by Dr. Bhatti. R. 595. Dr. Idriss's found Plaintiff's cervical and lumber spine range of motion was full and functional, although Plaintiff had some pain when extending. R. 907. Dr. Idriss observed some tenderness in Plaintiff cervical and lumbar spine, but Plaintiff's straight leg-raising test, Faber test, Spurling Test and Babinski sign were negative. R. 907.

This objective medical evidence tends to show that Plaintiff's condition was not disabling, as the ALJ concluded. This evidence is more than sufficient to be considered substantial evidence in support of the ALJ's conclusions.

Additionally, the conservative course of treatment for Plaintiff's condition provides additional evidence that the condition was not disabling. As discussed, Plaintiff's condition did not require emergency treatment or hospitalization. R. 591. Plaintiff's treating medical professionals prescribed medications for pain, headaches, acid reflux and restless leg syndrome. *See e.g.*, R. 652, 649, 644, 768. Plaintiff often reported the medications were helping her symptoms. R. 649, 768. Plaintiff told Dr. Gibbs, in Plaintiff's psychological consultative examination, that she had never seen a mental health professional and instead "deals with it on [her] own." R. 902. Further, Dr. Zweifler noted that Plaintiff had no history of psychiatric hospitalization or treatment, and that Plaintiff reported improvement with medication. R. 222.

In regards to both Plaintiff's physical and psychological conditions, her treating medical professionals prescribed a conservative course of treatment that typically involved medications. Often times, Plaintiff reported progress with this conservative course of treatment. Such a course of treatment is evidence that Plaintiff's condition is not disabling and supports the ALJ's finding that Plaintiff's condition and symptoms are not disabling.

Finally, Plaintiff's daily activities support the ALJ's finding. Plaintiff testified that she is able to do some cleaning and cooking and that she is able to drive and socialize. R. 40-47, 51. Prior to moving in with her father, Plaintiff kept house and kept the books and trucking log for her roommate, who was a truck driver. R. 41, 53. When she moved in with her father, she took care of her ailing father and made sure he received his daily meals and medicine. R. 40, 42. Although Plaintiff did receive assistance from her then-boyfriend and a nurse in taking care of her father, Plaintiff's testimony establishes that she was a caretaker, who did work around the house and for her father. Further, Plaintiff reported that at the time of her application she was able to do household work, pay bills, count change, handle a saving account, and use a check book. R. 544.

These details of Plaintiff's daily activities support the ALJ's conclusion that her condition caused only a mild restriction on her daily life. *See* R. 14 (for ALJ's conclusion). This finding and the details of Plaintiff's daily activities support the ALJ's finding that Plaintiff's condition is not disabling. The fact that Plaintiff is able to do all this in her daily life again provides substantial evidence to support the ALJ's findings.

This Court's review of the ALJ's findings is limited to determining if substantial evidence exists to support the ALJ's determinations. In this case, Plaintiff challenges the ALJ's determination that her condition is not disabling. This Court finds that based on the objective medical evidence, the conservative course of treatment, and the evidence of Plaintiff's daily life, the ALJ's finding that Plaintiff's condition is not disabling is supported by substantial evidence.

## **RECOMMENDATION**

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment be DENIED; the Commissioner's Cross Motion for Summary Judgment be

GRANTED; the final decision of the Commissioner be AFFIRMED; and Judgment be entered in favor of the Commissioner.

## REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____/s/_____

Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
January 3, 2013

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Dawn E. Simpson
818 Draymore Lane
Elgin, SC 29045
(803) 549-0437

Virginia Lynn Van Valkenburg
United States Attorney Office
101 W Main St
Suite 8000
Norfolk, VA 23510
(757) 441-6331
Email: Virginia.VanValkenburg@usdoj.gov

Fernando Galindo, Clerk

By _____
          Deputy Clerk
          January __, 2013